AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>United States of America<br><br>v.<br><br>JUSTIN DINO PINEDA,<br><br>Defendant</td><td>Case No.    2:22-mj-04583-DUTY</td></tr>
</table>

LODGED
CLERK, U.S. DISTRICT COURT
11/21/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:        cd        DEPTUY

FILED
CLERK, U.S. DISTRICT COURT
November 21, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October ~~19,~~ 18 2022, in the county of Los Angeles in the Central District of California, the defendant

violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 953 | Exportation of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Michael Yun
*Complainant's signature*

Michael T. Yun, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    November 21, 2022

*Judge's signature*

City and state:    Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Amanda Elbogen (x5748)

## **AFFIDAVIT**

I, Michael T. Yun, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Justin Dino PINEDA ("PINEDA") for a violation of 21 U.S.C. § 953 (exportation of methamphetamine).

2. This affidavit is also made in support of applications for warrants to search 1311 W. 5th Street, Los Angeles CA 90017 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, a 2020 Nissan, Maxima, California license plate number 8WNA870 and VIN: 1N4AA6DV8LC361558 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2, and the person of PINEDA as described more fully in Attachment A-3.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 953 (exportation of methamphetamine) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

1

warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed since December 2016. I graduated from the Criminal Investigator Training Program (CITP-716) at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, in May 2017, and graduated the HSI Special Agent Training (HSISAT-705) at FLETC in September 2017.  Before joining Federal Law Enforcement, I was a sworn Police Officer and Criminal Investigator for the New York State Office of the Attorney General for two years, from 2014 to 2016.  Before that, I was a Criminal Investigator for the New York State Department of Taxation and Finance for four years, from 2010 to 2014. I graduated from the John Jay College of Criminal Justice, City University of New York, with a Bachelor of Arts in Criminal Justice, in 2009.

6.    During my tenure at HSI, I have participated and led more than a dozen criminal investigations involving the importation, exportation, and distribution of narcotics. Through my training, education, and experience, I have become familiar with how illegal drugs are imported, exported, and distributed, the method of payment for such drugs, and the

efforts made by those involved in drug trafficking to avoid detection by law enforcement.  I have experience in executing more than a dozen search warrants and arrest warrants.

## III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On October 18, 2022, Justin Dino PINEDA delivered 11 duffle bags containing a total of approximately 220 kilograms of methamphetamine to HSI Undercover Agents ("HSI UC 1" and "HSI UC 2") in the parking lot of a Home Depot located at 2450 Cherry Ave, Signal Hill, CA 90755.  HSI UC 1 exchanged a Honduran Dos Lempiras bill (Serial # AE900782), a predetermined token between HSI UC-1 and the Australian Drug Trafficking Organization, with PINEDA for the 11 duffle bags of methamphetamine.  PINEDA drove the SUBJECT VEHICLE to and from the drug transaction.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    **An Australian Drug Trafficking Organization Plans to Export Drugs by Boat to the United States**

8.    On or about September 1, 2022, Australian Federal Police ("AFP") Liaison Officer Robert Jenner notified me and other HSI Los Angeles International Airport ("HSI LAX") Special Agents that an individual known to law enforcement as "Whispers", a member of an Australia-based Drug Trafficking Organization ("DTO"), had asked "MrBig", who was actually an Undercover Operative working with Australian law enforcement (the "Australian UC"), to facilitate the export of approximately 250 kilograms of cocaine via sea vessel from California to Sydney, Australia.

9.   Per New South Wales Police Force ("NSWPF") Undercover Supervisor Detective Sergeant Grant Prosser, on or about October 14, 2022, "Whispers" communicated with the Australian UC through the "Threema" messaging application and stated that the DTO would be exporting 200 units of "eye" (code word for methamphetamine) instead of 100 units of "nose" (code word for cocaine).  On or about October 15, 2022, HSI LAX provided the Australian UC with the "Threema" messaging application account number for HSI UC 1.  The Australian UC introduced HSI UC 1 into a "Threema" chatroom to discuss the logistics of delivering drugs from a member of the Australian-based DTO operating in Los Angeles to HSI UC 1 in Los Angeles.  There were several "Threema" handles in the "cauliflower" chatroom and, according to AFP Federal Agent Claudia Lindsay and NSWPF Detective Senior Constable Julie O'Leary, at least two of the handles belonged to members of the Australian DTO: "BTK" and "NarcoSainte666." These handles were the ones primarily communicating with the HSI UC's "Threema" handle, "ElPaco323," and the Australian UC's "Threema" handle, "MrBig."  "BTK" was the user facilitating the details of the delivery of narcotics in LA.  I have reviewed the "Threema" chats.

10.  On or about October 16, 2022, in the "Threema" chatroom, "BTK" sent a picture of numerous "zip lock" bags of suspected narcotics laid out on the floor of a room with two windows covered with window shades.  The following conversation took place:

"BTK":                  "Let's plan for the 18th so we have
                        room to maneuver. How we want
                        these sealed? Let me know early so
                        my side has time to seal them how
                        you want."

"NacroSainte666":       "Mr big"

Australian UC:          "Easiest for us is in sports bags.
                        20/25 in each bag or whatever fits
                        depending on size of bag. Makes it
                        easier for us to carry around
                        brother."

"BTK":                  "So don't need to vac seal?"

Australian UC:          "Yes vac seal brother."

"BTK":                  "Once? Twice? And I'll use duffle
bags since you said easier."

Australian UC:          "What size bags are they in at the
                        moment? If you can vac seal twice
                        in lots of 5. Then load up each
                        duffel bag with 20/25 or whatever
                        fits."

"BTK":                  "5kg per seal? It wont fit bro I
                        think we can do double seal 1 kg
                        bags or maybe 2kg bags 5 kg itll
                        be tough."

Australian UC:          "Ok. If you can do 2kg do that
                        otherwise do it in 1kg bags. As

|  |  |  |
|---|---|---|
|  |  | long as put 20/25 in each duffel bag." |
| "BTK": | | "Ok brother on it." |
| HSI UC 1: | | "Perfect. We're set for the 18th at noon. Just to confirm, we doing 100 or 220?" |
| "BTK": | | "At least 100." |
| "NarcoSainte666": | | "We going 220." |

11. On or about October 17, 2022, in the "Threema" chatroom, the following conversation took place:

| "BTK": | | "220. Brother. We ran out of vac bags. He will grab in am. Can you hand me a serial and address." |
|---|---|---|
| Australian UC: | | "Ok brother. Paco will arrange token and address will be given first thing in morning." |
| "NarcoSainte666": | | "Last things request from me to BTK side is mark every vacuum seal bags is original. When here packaging same. So no one misunderstood the." |
| "BTK": | | "Yes when your driver gets it. Make sure open duffle and also send us photos." |

12. On or about October 18, 2022, in the Threema chatroom, HSI UC 1 sent a picture of a Honduran Dos Lempiras bill and the following conversation took place:

| | |
|---|---|
| HSI UC 1: | "Alright boys. A lucky $2 to bring it home. See the serial. We set for a noon drop?" |
| "BTK": | "Whats latest time? Also send me a address. Cant make noon. Whats latest time? Also need address. So we know how far you are." |
| HSI UC 1: | "Hey brother what's the earliest you can make it to Long Beach? I can check with my guy to see what window we have." |
| "BTK": | "Let me ask. We passing to you right. Not bring it inside the port?" |
| HSI UC 1: | "Right. Passing to me in Long Beach and I take it to the port. I just have limited windows of time to move it in carefully." |
| "BTK": | "OK lmk what is latest time." |
| HSI UC 1: | "Just talked to my guy. Latest time he'll get me in today is 2pm. It'll take me about 30 minutes to drive in to the port. So 1:15ish is latest I can do." |
| Australian UC: | "@BTK I thought all agreed for noon? Is there a hold up?" |
| "BTK": | "Pass me address." |

7

HSI UC 1:               "2450 Cherry Avenue, Signal Hill, CA."

"BTK":                  "Wont make 115. Hes 1.5 hrs from long beach. Are you able to get time pushed back a little bit or what options we have?"

HSI UC 1:               "Is he on the road yet?"

"BTK":                  "He said he can be there 3pm."

HSI UC 1:               "I'm making calls and trying to push other appointment. Give me a minute."

(A few minutes later.)

HSI UC 1:               "Send it."

"BTK":                  "Ok. He will see you at 3pm."

13. On October 18, 2022, at approximately 2:43 PM, in the "cauliflower" chatroom, the following conversation took place:

HSI UC 1:       "I'm here. What vehicle is he coming in?"

"BTK":                  "Let me ask."

(Approximately five minutes later.)

"BTK":                  "Black Nissan. 3 mins out."

                        (Referring to the SUBJECT VEHICLE)

(Approximately two minutes later.)

"BTK":                  "Hes there."

"Whispers":             "Please confirm token."

"BTK":                  "Ok."

|            |                                        |
|------------|----------------------------------------|
| HSI UC 1:  | "I think I see him. Tell him white     |
|            | Nissan van behind him. Park next       |
|            | to passenger side."                    |
| "BTK":     | "Ok."                                  |

Approximately three minutes later, "BTK" sent a picture of the Honduran Dos Lempiras Bill, and pictures of the methamphetamine in vacuum sealed bags – which were numbered 1 through 110, in black marker – on the floor of what appears to be the same room from the picture that was sent on October 16, 2022.

**B.   PINEDA Delivered 220 kilograms of Methamphetamine**

14.   On October 18, 2022, at approximately 12:00 PM, HSI UC 1 and HSI UC 2 parked their vehicle on the west side of the parking lot of a Home Depot located at 2450 Cherry Ave, Signal Hill, CA 90755.  HSI Special Agents, including members of the HSI Special Response Team ("SRT"), were positioned in the Home Depot parking lot and the surrounding areas to provide cover for the safety of the HSI UCs and to maintain a visual of the meeting between the HSI UCs and driver of the drugs, later identified as PINEDA.

15.   At approximately 2:52 PM, HSI Special Agents, including members of the HSI SRT, saw the SUBJECT VEHICLE arrive at the Home Depot parking lot and park on the westside next to the HSI UCs' vehicle.  PINEDA exited the driver side door of the SUBJECT VEHICLE.  There were no other occupants in the SUBJECT VEHICLE.  PINEDA greeted the HSI UCs and asked for the Token (a Honduran Dos Lempiras bill (Serial # AE900782), a predetermined token between the HSI UC and the Australian Drug Trafficking

Organization).  HSI UC 1 gave PINEDA the Token.  PINEDA opened the SUBJECT VEHICLE's doors and trunk and took out duffle bags. PINEDA handed the duffle bags to the HSI UCs to load into their vehicle.  HSI UC 1 was wearing a video and audio recording device, and HSI UC 2 was wearing an audio recording device. Both devices captured this exchange between the HSI UCs and PINEDA, including clear images of the driver's face.

16.  The HSI UCs were not paid by PINEDA; the Australian UC was supposed to receive a percentage of the value of the narcotics once it arrived in Australia, from the Australian DTO. Once the HSI UCs had received all 11 duffle bags, PINEDA got into the SUBJECT VEHICLE and drove out of the Home Depot parking lot, and a HSI surveillance team followed the SUBJECT VEHICLE. The HSI UCs got into their vehicle and also drove out of the Home Depot parking lot.  HSI Special Agents followed the HSI UCs.

17.  HSI Special Agents received the 11 duffle bags from the HSI UCs at the HSI Long Beach Office.  All the 11 duffle bags were filled with clear heat-sealed plastic bags containing a white crystal-like substance.  One of the clear heat-sealed plastic bags was picked at random, which had the number "47" written on it, and was field tested for narcotics using the TruNarc Device.  The substance tested positive for methamphetamine.  The 11 duffle bags contained a total of approximately 220 kilograms of methamphetamine.

18.  On October 18, 2022, HSI Special Agents followed the SUBJECT VEHICLE from the Home Depot parking lot to the SUBJECT

PREMISES located at 1311 W. 5th Street Los Angeles, CA 90017. The address for the SUBJECT PREMISES is the same address listed on the SUBJECT VEHICLE's registration and PINEDA's driver license, which I have reviewed.  During the narcotics transaction between PINEDA and the HSI UCs, PINEDA told the HSI UCs that he loaded the duffle bags into his car himself.  HSI UC-1 was wearing a video and audio recording device, which captured this conversation.  The video and audio recording also captured the SUBJECT VEHICLE driver's face and the t-shirt he was wearing, which was a dark colored t-shirt with the word "NIKE" and the Nike Swoosh logo printed on the chest.  The HSI UCs confirmed that PINEDA's driver license picture matched the face of the driver of the SUBJECT VEHICLE.

19.  On October 26, 2022, HSI Special Agents obtained the Lease Agreement for the SUBJECT PREMISES, which is apartment 416 of 1311 W. 5th Street Los Angeles, CA 90017, between the Target and Bixel at Fifth, from the management company of the apartment building.  The leasing agreement lists PINEDA as the current resident of apartment 416 since February 23, 2021.

20.  On October 26, 2022, HSI Special Agents obtained video footage for the garage of 1311 W. 5th Street Los Angeles, CA 90017 from Bixel at Fifth.  In the video footage for October 18, 2022 (the same day PINEDA delivered drugs to the UC), which I have reviewed, I saw the following:

a.  At approximately 1:52 PM, PINEDA – wearing the same dark colored t-shirt with the words "NIKE" and the Nike Swoosh logo printed on the chest – exited the left elevator on

11

the garage level, while another unknown male remained in and held the elevator, with what seemed to be the same duffle bags containing suspected methamphetamine.

b.    The right elevator was out of camera view but both elevators were next to each other.  In the video footage, PINEDA walked off the camera view, and moments later, a Black Nissan Maxima (the "SUBJECT VEHICLE") parked in front of the elevators, and PINEDA exited the driver side of the SUBJECT VEHICLE.  Both men began to load the duffle bags they had into the SUBJECT VEHICLE.

c.    At approximately 1:56 PM, both men finished loading the vehicle with the duffle bags they had and closed the trunk and doors.  Both men entered the right elevator, leaving the SUBJECT VEHICLE parked in front of the elevators unattended. During this time, no one else is observed putting anything into the SUBJECT VEHICLE or retrieving anything from the SUBJECT VEHICLE.

d.    Moments later, both men returned into camera view with more duffle bags and loaded them into the SUBJECT VEHICLE. At approximately 2:04 PM, PINEDA entered the driver side door of the SUBJECT VEHICLE.  PINEDA used his cellphone as he was driving and approaching the garage gate to exit.  At approximately 2:05 PM, the SUBJECT VEHICLE exited the garage.

21.  On October 26, 2022, HSI Special Agents were told by the Leasing Agent of Bixel at Fifth that PINEDA and another man live together in apartment 416, and that the unknown male observed in the video footage assisting PINEDA load the duffle

bags into the SUBJECT VEHICLE, looks like that man. The leasing agent also stated that the second, unknown male is not listed on the apartment lease.

22. On November 16, 2022, the Honorable Pedro V. Castillo, United States Magistrate Judge, authorized a warrant for a tracking device on the SUBJECT VEHICLE.  The tracking device was installed November 16, 2022.  GPS data for the SUBJECT VEHICLE confirmed that the car spends its evenings outside the SUBJECT PREMISES.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on

their cell phones and other digital devices, in their
residences, and in their cars.

       c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates, customers, and
suppliers on their digital devices and in their residence,
including in the form of calendar entries and location data.

       e.   Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

       f.   Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate

on a cash basis.  Such currency is often stored in their residences and vehicles.

g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such

*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat

---

as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

  a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

          e.   In my training and experience, the person who is
in possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.  However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features, and it is also possible that the person in
whose possession the device is found is not actually a user of
that device at all.  Furthermore, in my training and experience,
I know that in some cases it may not be possible to know with
certainty who is the user of a given device, such as if the
device is found in a common area of a premises without any
identifying information on the exterior of the device.  Thus, if
while executing the warrant, law enforcement personnel encounter
a digital device within the scope of the warrant that may be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to every person who is a resident ~~located~~ at the SUBJECT
PREMISES during the execution of the search: (1) depress the
person's thumb- and/or fingers on the device(s); and (2) hold
the device(s) in front of the face of the person with his or her
eyes open to activate the facial-, iris-, and/or retina-
recognition feature.

2.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

27.   For all of the reasons described above, there is probable cause to believe that PINEDA has committed a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 953  (exportation of methamphetamine) there is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and the person described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this __21st__ day of __November__, 2022.


_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE